## DECLARATION OF KENNETH R. WALLENTINE

STATE OF UTAH        )
                            ) ss.
County of Salt Lake     )

I, Kenneth R. Wallentine, say and attest the following:

1.     I am the Chief of Police of the West Jordan, Utah Police Department and am also an expert in the area of police practices and procedures.

2.     My qualifications are described in detail in my Curriculum Vitae, which is attached hereto as Exhibit A.

3.     I was retained as an expert witness by Berke Law Firm PLLC in the case of Hernandez v. City of Phoenix, et al., Arizona Federal District Court Case No. 2:20-cv-00767-GMS.

4.     I was asked to provide my expert opinion regarding the officer involved shooting that took place on April 29, 2019, and whether certain actions taken by Officer Janser and the City of Phoenix Police Department were reasonable and consistent with generally accepted police practices.

5.     I was also asked to provide my expert opinion regarding Officer Janser's training and supervision and the training offered by the Phoenix Police Department in general.

6.     After reviewing the relevant records provided to me, I prepared a report pursuant to Fed. R. Civ. P. 26(a)(2), attached hereto as Exhibit B.

7.     That report contains a complete statement of my expert opinions as of that date and the basis and reasons for those opinions.  My opinions have not changed.

1

8.     Below are some of my expert opinions from my report.

9.     It is my expert opinion that the use of force by Officer Janser was reasonable and consistent with generally accepted police training, policies and practices.

10.    First, after reviewing the photographs of the replica gun Alejandro Hernandez ("Hernandez") was carrying on April 29, 2019, it is my expert opinion that a reasonable and well-trained officer would have believed that item Hernandez possessed presented a lethal threat.  The replica gun had dimensions and features consistent with a functional firearm.  The replica was covered with black electrical tape and a black cloth. The black cloth was at least partially secured with a blue, removable tape.  By covering the gun with black materials, it made it more difficult to discern it as a replica and more identifiable as a functional firearm. Additionally, the replica gun had been outfitted with a sling.  Firearm slings are rarely used on replica or toy firearms and are more commonly associated with a functional firearm.  This would further cause a reasonable and well-trained officer to believe Hernandez was wielding a functional firearm.

11.    Officer Janser utilized a Leupold Mark 4 CQ/T optic (scope) on his rifle to attempt to identify the nature of the weapon.  At full magnification, Officer Janser would have been viewing Hernandez from a perceived distance of nearly 116 feet. Officer Janser did what was safe and reasonable to determine what Hernandez was wielding.

12.    Even though Hernandez had not previously fired his weapon, Officer Janser perceived that he was about to be shot, perhaps fatally, and that his fellow officers and others in the area, including children, could also be shot, perhaps fatally.  A reasonable and well-trained officer would reach the same conclusion in the same circumstances.  Presented

with Hernandez brandishing and aiming what appeared to be a deadly firearm, a reasonable and well-trained officer would recognize that the officers and others present were facing an imminent threat of death and/or serious bodily injury.

13.     In the very epitome of a situation that was tense, uncertain and rapidly evolving, a reasonable and well-trained officer would have made the decision to shoot Alejandro to prevent him from shooting the officers and others in the area.

14.     Furthermore, even though he had been shot one time, Hernandez still gripped the weapon in his hands.  A reasonable and well-trained officer would not wait until the barrel of a gun is pointed at another person or themselves to reasonably perceive an ongoing imminent threat of serious bodily injury or death.  A reasonable and well-trained officer would have fired additional shots to end the threat.

15.     After reviewing the training records for Officer Janser, it is my expert opinion that on April 29, 2019, he was a well-trained and qualified law enforcement officer. Officer Janser successfully completed basic law enforcement training and a substantial number of additional training courses as a Phoenix Police Officer.  Officer Janser achieved initial peace officer certification by completion of all required training and examinations, and he continues to maintain certification by the Arizona Peace Officer Standards and Training Board ("POST") through compliance with annual required training.  Officer Janser had been certified to carry a patrol rifle since August 2009.  In addition to the basic police training on use of force taught at part of the mandatory Arizona POST Basic Training Course, Officer Janser had successfully completed a number of in-service training courses that discussed use of force and force decision making.

16. Despite having been certified to carry a patrol rifle for ten years, Officer Janser had never fired his police rifle in the line of duty prior to this incident, a testament to his restraint in the use of force and the tactical skills for which his supervisors frequently commended him.

17. The Phoenix Police Department provides a robust in-service training program that exceeds national practices for police training. The Phoenix Police Department is nationally accredited by the Commission on Accreditation for Law Enforcement Agencies (CALEA). The accreditation standards include requirements for best-practice training programs.

18. I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on this third day of March, 2023.

_____
Kenneth R. Wallentine

## Ken Wallentine
3330 West Signal Peak Drive, #RP318
Taylorsville, Utah 84129
krwallentine@gmail.com

*Curriculum vita summary*

- Chief of police since 2005
- Investigations Bureau Chief 2002-2005
- Law enforcement officer since 1982
- President, Utah Chiefs of Police Association
- Chair of Salt Lake County Officer-Involved Critical Incident Investigations Teams
- Member, Utah Commission on Criminal & Juvenile Justice
- Board of Advisors, Association of Force Investigations
- Licensed attorney since 1990
- Author of American Bar Association criminal procedure guidebook
- AELE Certified Litigation Professional
- Advanced Force Science Specialist®
- Certifications include: POST Firearms Instructor, TASER® Instructor, Excited Delirium and Sudden Death Investigation Instructor, LAPD Force Investigation Division Officer-Involved Shooting Investigation

Disclosure information for Fed. R. Civ. P. 26
January 1, 2022

*Employment*

I am the Chief of the West Jordan (Utah) Police Department, where I oversee all police operations and investigations. I became certified as a law enforcement officer and as a corrections officer in the State of Utah in 1982. I was formerly employed with the Utah Attorney General, where I served as the Chief of Law Enforcement.

After a period in private legal and consulting practice, I was a Supervisory Special Agent with the Utah Attorney General Investigation Division, where I developed a statewide use of force training initiative and coordinated officer-involved shooting investigations and other special investigations. I also serve in a consultation role as Senior Legal Advisor for Lexipol, the nation's leading provider of law enforcement risk and policy management resources.

I formerly served as a Bureau Chief at the Utah Department of Public Safety, Peace Officer Standards and Training Division, where I supervised investigations into allegations of improper and excessive force, officer integrity, and criminal acts alleged to have been committed by law enforcement officers and supervised in-service training administration and certification for all peace officers in the State of Utah. I also supervised the police service dog training and certification program for the State of Utah. I had responsibility for policy drafting and review for the parent agency, the Utah Department of Public Safety.

My duties included direct supervision and command of various investigative units and agents throughout the State of Utah, supervising law enforcement officers, forensic specialists, and technicians. I commanded the State of Utah Child Abduction Response Team. I commanded the State of Utah Officer-Involved Fatality Investigation Team. I was a member of the Board of Review of the Utah Technical Assistance Program, consulting in cold case homicide and complex violent person crimes investigations. In 2010, Governor Herbert selected me for the

COP-HERNANDEZ002864

Governor's Leadership in Public Service award for my work in public safety leadership.

*Law enforcement teaching experience and certifications*

I was formerly responsible for providing delivery of the Basic Training Curriculum related to all legal subjects, as well as certain tactical subjects, at the Utah Law Enforcement Academy. I continue to teach at the Utah Law Enforcement Academy. I am the author of the police academy curriculum currently in use for several subjects, including, but not limited to, use of force, reasonable force, use of force and police service dog teams, search and seizure, search and seizure for police service dog teams, and use of force/firearms instructor liability.

I am a certified POST Firearms Instructor, and have served as the lead instructor for POST Firearms courses. I am certified by the Force Science Research Center as a Force Science Analyst® and an Advanced Force Science Specialist®. I am a former certified TASER® Instructor. I am a certified Excited Delirium and Sudden Death Investigation Instructor. I was certified by the Los Angeles Police Department in Officer-Involved Shooting Investigation. In 2011, I was certified by the Institute for the Prevention of Sudden In-Custody Death as an instructor in restraint systems. I am a Certified Litigation Professional, certified by the Americans for Effective Law Enforcement.

*Legal practice*

I am a licensed attorney, having continuously licensed to practice law since 1990. I am admitted to practice before the United States Supreme Court, the Courts of Appeals for the Fifth and Tenth Circuits, and the State and Federal courts in the State of Utah. I am a former Chief Deputy County Attorney and a former Utah Attorney General designated special prosecutor. I am a Master of the Bench of the American Inns of Court, Inn One, where I also served as the past-President of the Inn of Court. I serve as an Administrative Law Judge for the State of Utah and for various counties and cities in Utah, providing hearing officer and appellate hearing services for hearings involving allegations of police officer misconduct for a variety of state agencies and municipalities. I was formerly on the faculty of Excelsior College, teaching Criminal Procedure, Evidence and Management Strategies for Public Safety.

I served two terms as Commission Chairman of the Salt Lake County Peace Officer Merit Service Commission, appointed by the Salt Lake County Mayor and the Mayors of the various municipalities that comprise the Unified Police Department of Greater Salt Lake County. In that capacity, I directed the commission that oversees the hiring, promotion, discipline and termination of all sworn officers of the Salt Lake County Sheriffs Office, Salt Lake County Protective Services Office and the Unified Police Department. I currently serve as a member of the Salt Lake County Criminal Justice Advisory Council

I was the longest serving member of the Utah Board of Mandatory Continuing Legal Education, an independent committee serving on behalf of the Utah Supreme Court. I was first appointed in 1996 and was reappointed by the Chief Justice to serve through 2016.

*Consultation practice*

In addition to my primary employment, I occasionally consult and provide expert witness opinions on police procedures, and use of force issues. I occasionally perform in-custody death investigations and officer-involved shooting death investigations for agencies which may lack the requisite expertise. I am a consultant to the Utah Risk Management Mutual Association, the state's largest insurer of public safety agencies, on matters of officer conduct and discipline, hiring and screening practices, use of force, and police pursuit policies.

COP-HERNANDEZ002865

I am the co-founder of a best practices advisory group that developed comprehensive model policies and best practices under the authority of the Utah Chiefs of Police Association, the Utah Sheriffs Association and various state law enforcement agencies.  These policies serve as a model for all Utah public safety agencies.  I am the author of a number of model policies for law enforcement agencies, and have provided policy drafting and policy review services for several agencies, including policy drafting responsibility for large law enforcement agencies.  I have served as a contract consultant to the United States Department of Justice, assigned to provide technical assistance and management consulting to various public safety entities in the United States.

*Professional activities and organizations*

I participate and serve in a number of community and professional capacities.  I am the President of the Utah Chiefs of Police Association.  I represent the Utah Chiefs of Police Association on the League of Cities and Towns Listen, Love, Learn Task Force, creating strategies for police reform and relations with communities of color.  I am a founding member of First Steps to More Trust, an initiative to join young persons in the BIPOC community with young public safety professionals in leadership training and community engagement.  In 2021, I was recognized by D.A.R.E. America as the "Law Enforcement Executive of the Year." In 2022, I was named as the major city "Utah Police Chief of the Year" by the Utah Chiefs of Police Association.  Also in 2022, upon nomination of the Attorney General, I was named as the "Utah Public Safety Officer of the Year" the Utah Best of State Foundation.

I am the Chair of the Governing Board of the Officer-Involved Critical Incident Investigations Teams in Salt Lake County, Utah, and have direct command of Officer-Involved Critical Incident Investigations Team IV.  I am the Chair of the Salt Lake County Law Enforcement Administrators and Directors Association.  I serve on the Salt Lake County Criminal Justice Advisory Council.  I currently serve on the Use of Force Standards and the K9 Standards Committees of the Utah Peace Officer Training and Standards Division, statutorily charged with articulating the standards for use of force by police officers and deployment of police service dogs.  I am a member of the Statewide Information and Analysis Center Governance Board.  I also serve as a member of the Utah Communications Authority Public Safety Advisory Board.

Other professional activities include serving as a member of the Utah Commission on Criminal & Juvenile Justice and a member of the Utah Behavioral Health Master Plan Executive Committee.  I serve on the Board of Directors of the Institute for the Prevention of Sudden In-Custody Death.  I am also a member of the Board of Advisors, Association of Force Investigations, former member of the Board of Directors of Crisis Intervention Team Utah, Past-President of the Utah Peace Officers Association, former Board Member of the Utah SWAT Association, member of the International Association of Law Enforcement Educators and Trainers Association, member of the International Association of Chiefs of Police and the Utah Chiefs of Police Association, member of the National Tactical Officers Association, member of the International Association of Law Enforcement Firearms Instructors, member of the International Association of Directors of Law Enforcement Standards and Training, member of the International Law Enforcement Educators and Trainers Association, member of the K9 Section of the Utah Peace Officers Association, member of the United States Police Canine Association, Life Member and past member of the board of directors of the NAACP, Salt Lake City branch, and board member and co-Chairman of the Utah Law Enforcement Legislative Committee.

I served as a gubernatorial appointee to the Council on Peace Officer Standards and Training.  I am a former member of the Scientific Working Group on Dog and Orthogonal Detector Guidelines, a national scientific best practices organization sponsored by the Federal Bureau of Investigation, the Department of Homeland Security, and the Transportation Security

COP-HERNANDEZ002866

Administration, with support coordinated by the International Forensic Research Institute at Florida International University.  I have been a presenter at a variety of professional conferences and seminars, including presenting on use of force training at the annual convention of the International Association of Chiefs of Police and the International Conference of the Institute for the Prevention of Sudden In-Custody Death.

*Publication history*

I have previously published a number of other professional articles, many of which have been subjected to peer review.  My most recent book, *Preparing for an Active Shooter Threat*, was published in June 2020 by Blue360 Media.  Another book, *Street Legal: A Guide to Pre-trial Criminal Procedure for Police, Prosecutors, and Defenders*, 2ⁿᵈ edition, was published in 2020 by the American Bar Association Publishing Division.  It is a treatise on public safety and criminal procedure.  *The K9 Officer's Legal Handbook*, 3ʳᵈ ed., was published in February 2019.

My other published works include:   *An Outward Mindset Powering Multicultural Policing*, Police Chief, V. 89, No. 4 (April 2022); *Mitigating Suicide Threat Response Risks*, Police Chief, V. 86, No. 3 (2019);  *Avoiding a Peer Support Pitfall*, Police Chief, V. 85, No. 3 (2018); *Avoiding a Peer Support Pitfall*, Police Chief, V. 85, No. 3 (2018); *Should I Stay or Should I Go?*, POLICE, October 2017, *Hill v. Miracle: Adapting the Graham Standard to Non-Criminal Interventions*, Police Chief (August 2017): 18–19; *Armstrong v. Village of Pinehurst: Training and Policy Implications for Police*, Police Chief, V. 83, No. 6 (2016); *Supreme Court Decision Casts Doubt on Hotel Registry Ordinances*, Police Chief, V. 81, No. 10 (2015); *Body Worn Cameras: Plan Before Your Office Buys In*, The Sheriff (June 2015); *Legal Risks of Failing to Care for Children of Arrested Persons*, Police Chief, V. 81, No. 10 (2014); *A Rational Foundation for Use of Force Policy, Training and Assessment*, 2014 (2) AELE Mo. L. J. 101; *Post Incident Video Review*, Police Chief, V. 68, No. 12 (2011);  *Cell Site Location Evidence: A New Frontier in Cyber Investigation,* 2 A.E.L.E. Mo. L.J. 401 (2011).

*Litigation history*

I have testified and/or provided depositions in the following cases (limited to the past four years):

*Coleman v. City of Tempe*, No. 2:17-cv-02570 PHX DLR, United States District Court for the District of Arizona, 2022.  Trial testimony given on behalf of defendants.  Subject matter: police use of force.

*Caney v. Gillette, et al.* No. CV 2019-011516, Superior Court of Arizona for Maricopa County, 2021.  Deposition testimony given on behalf of defendants.  Subject matter: traffic crash.

*Brown v. City of Phoenix*,  No. 2:20 cv 02087 DLR JZB, United States District Court for the District of Arizona, 2021.  Trial testimony given on behalf of defendants.  Subject matter: police use of force.

*Coleman v. City of Tempe*,  No. 2:17-cv-02570 PHX DLR, United States District Court for the District of Arizona, 2021.  Trial testimony given on behalf of defendants.  Subject matter: police use of force.

*Khalaj v. City of Phoenix, et al.*, CV-17-01199-PHX-GMS, United States District Court for the District of Arizona, 2021.  Deposition testimony given on behalf of defendants.  Subject matter: police use of force.

*Bueno v. Howard, et al.*, No. 2:16-cv-03450-DGC-JZB, United States District Court for the

COP-HERNANDEZ002867

District of Arizona, 2021.  Trial testimony given on behalf of defendants.  Subject matter: police use of force.

*Lane v. City of Mesa*, No. 2:19-cv-00852-DJH, United States District Court for the District of Arizona, 2021.  Deposition testimony given on behalf of defendant.  Subject matter: wrongful death.

*Mitchell v. City of Cedar Rapids*, No. LACV087209, Iowa District Court for Linn County, 2021.  Deposition testimony given on behalf of defendant.  Subject matter: wrongful death.

*Johnson v. City of Mesa*, No. 2:19-CV-02827-JAT-JZB, United States District Court for the District of Arizona, 2020.  Deposition testimony given on behalf of defendant.  Subject matter: police use of force.

*Ortega v. United States of America*, No. CV-19-08110-PCT-JAT, United States District Court for the District of Arizona, 2020.  Deposition testimony given on behalf of defendant.  Subject matter: police custody.

*Peralta v. Arizona Department of Public Safety*, No. CV-17-01868-DJH-BSB,  United States District Court for the District of Arizona, 2020.  Trial testimony given on behalf of defendant.  Subject matter: police custody.

*Krakana & Zinn v. City of Scottsdale*, No. CV-17-01813-PHX-JJT,United States District Court for the District of Arizona, 2020.  Trial testimony given on behalf of defendant.  Subject matter: police tactical operation.

*A.C. v. County of Santa Barbara*, No. 2:18-CV-3694 SK, United States District Court for the Central District of California, 2019.  Deposition testimony given on behalf of defendant.  Subject matter: police use of force.

*Smith v. City of Waterloo*, Case No. LACV133172, District Court for Black Hawk County, Iowa, 2019.  Trial testimony given on behalf of defendants.  Subject matter: emergency vehicle operation.

*Mould v. City of Tempe*, No. CV2016-018161, United States District Court for the District of Arizona, 2019.  Trial and deposition testimony given on behalf of defendant.  Subject matter: wrongful death.

*Castro v. State of Arizona*, Case No. 2:18-cv-00753-SRB, United States District Court for the District of Arizona, 2019.  Deposition testimony given on behalf of defendants.  Subject matter: police use of force.

*Lawrence v. Las Vegas Metro Police Department*, No. 2:16-cv-03039-JCM-NJK, United States District Court for the District of Nevada, 2019.  Deposition testimony given on behalf of defendants.  Subject matter: wrongful death.

*Webb v. City of Waterloo*, No. 6:17-cv-2001-CJW-MAR, United States District Court for the Northern District of Iowa.  Deposition testimony given on behalf of defendants.  Subject matter: police use of force.

*Charboneneau v. Demings*, No. 2017-CA-010862-O, Ninth Judicial District Court, Orange County, Florida, 2019.  Hearing testimony given on behalf of defendants.  Subject matter: use of force.

COP-HERNANDEZ002868

*Carsons v. Black Bear Reserve Homeowners Association, Inc., et al.*, No. 35-2015-CA-001910, Fifth Judicial District Court, Lake County, Florida, 2018.  Deposition testimony given on behalf of defendants.  Subject matter: investigative procedures.

*McSwain v. United States*, No. 2:15-cv-01321, United States District Court for the District of Nevada, 2018.  Deposition testimony given on behalf of defendant.  Subject matter: negligence.

*Rodriguez v. City of West Covina*, No. 2:17-CV-0138 CBM, United States District Court for the Central District of California, 2018.  Deposition testimony given on behalf of defendant.  Subject matter: police force and canines.

*Mims v. City of Charlotte*, No. 2014-CVS-23815, Superior Court of North Carolina, 2018.  Trial and deposition testimony given on behalf of the defendants.  Subject matter: wrongful death.

*Chastang v. Levy*, No. 6:17-cv-00538-Orl-37DC, United States District Court for the Middle District of Florida, 2018.  Deposition testimony given on behalf of defendant.  Subject matter: police use of force.


*Consultation and Expert Witness fees, effective December 31, 2021 through December 31, 2022*

For matters which progress beyond an initial brief consultation, I charge $300.00 per hour for examination of reports and documents, site visits, interviews, administrative tribunal, deposition or court testimony, with a minimum fee of $1,200.00 for deposition or court testimony.  I bill for actual travel expenses and a travel fee of $1,200.00 per day/part-day for travel to western states and $1,750.00 per day/part-day outside western states.  Unless airline tickets are pre-paid by the client, I travel only with tickets purchased as fully refundable fares.

**COP-HERNANDEZ002869**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

|  |  |  |
|---|---|---|
| | : | |
| Justina Hernandez, *et al.*, | : | |
| Plaintiffs, | : | No. 2:20-cv-00767-GMS |
| vs. | : | |
| City of Phoenix, *et al.*, | : | Report of Kenneth R. Wallentine |
| Defendants. | : | |

The following report of Kenneth R. Wallentine is submitted after reviewing the following documents, pleadings, records, reports:

Plaintiffs' 1st Amended Complaint

Defendants' Answer

Defendant City of Phoenix's 2nd Supplemental Disclosure Statement

Defendant City of Phoenix's Responses to Requests for Production

Plaintiffs' 1st Supplemental Disclosure Statement

Defendants' Responses to Interrogatories

Defendant Janser's Responses to Interrogatories

Defendant Janser's Responses to Requests for Admissions

Plaintiffs' Responses to Interrogatories and Requests for Admissions

Plaintiffs' Supplemental Responses to Interrogatories

Phoenix Police Department DR 201900000722449

Phoenix Police Department Use of Force Board Report

Phoenix Police Department Radio CAD log

COP-HERNANDEZ002834

Audio recordings from 911 calls and radio broadcasts

Phoenix Police Department Division files, Human Resources files, Training files, Supervisors' Notes, and Fiscal Management Bureau files for Trevin Janser

Medical Examiner records

Phoenix Police Department Unit Histories for Trevin Janser, Daniel Bill, Bryan Welsh, Benjamin Ippel, Brian Lilly, Brody Wiley, David Hynes, Johnny Cabrera, Ryan Cornelius, Tyler Kipper, Jacob Betzhold, Keith Backhaus, Robert Baraban, Stephen Cullen, Steven Hawes, and Justin Prewitt

Daniel Buskin report

Photographs of officers and scene

Audio recordings from interviews of Trevin Janser, Anna Hernandez, Benjamin Ippel, Brian Lilly, Brody Wiley, David Hynes, Johnny Cabrera, Ryan Cornelius, Todd Green & Tyler Kipper

Transcripts from interviews of Trevin Janser, Anna Hernandez, Benjamin Ippel, Brian Lilly, Brody Wiley, David Hynes, Johnny Cabrera, Ryan Cornelius, Todd Green & Tyler Kipper

Deposition of Anna Hernandez

Deposition of Justina Hernandez

Kenneth R. Wallentine states as follows:

I.      In the instant matter I have relied upon the documents, pleadings, records, photographs (including video screen capture), reports, and statements previously described.  I have formed a number of opinions based upon the aforementioned, as well as my experience, education and familiarity with professional standards, practices, and publications.  My opinions, and a summary

COP-HERNANDEZ002835

of the circumstances known or reported to me upon which those opinions are based, are set forth herein as follows.

**Abbreviated summary of reported events:**

On April 29, 2019, at around 0940, Anna Hernandez[1] contacted 911 to request assistance at 1211 North 33rd Street, Phoenix, Arizona. Her brother, Alejandro, was the subject of an Order of Protection on behalf of her and her parents. The terms of the Order of Protection barred him from being at the home at 1211 North 33rd Street. Alejandro had returned to the residence despite the Order of Protection[2] and he appeared to be high on illicit drugs. Alejandro's mother, Justina Hernandez, was at the house and contacted his father, Jose Hernandez, to report that Alejandro was there. Jose then called Anna while she was at work and told her Alejandro was at the house and had used drugs. Anna was afraid for her parents' safety and was concerned about what would happen if Alejandro was out on the streets. She was worried he might do something to harm others or himself. Anna believed that having Alejandro arrested for violating the Order of Protection was the best option to keep her family safe. She called 911 and reported the information to dispatch before quickly going to the residence.

Phoenix Police Department Sergeant Tyler Kipper responded to the residence with Officers Johnny Cabrera and Benjamin Ippel arriving shortly after. They contacted Justina outside the residence, and they were able to determine Alejandro had last been in a room in the back of the residence. Sergeant Kipper and Officers Cabrera and Ippel cleared the residence and found Alejandro had left the residence, presumably through the back door.

Sergeant Kipper left to attend to another call while Officer Cabrera gathered information from Justina. Anna arrived during this time and Officer Ippel retrieved a victim's rights

---

[1] The Hernandez family members are referred to by their given names for clarity as they all share the same surname.

[2] Arizona law provides for immediate arrest for violation of an Order of Protection, Ariz. Rev. Stat. § 13-3602(R).

COP-HERNANDEZ002836

pamphlet to give to her.  Officer Cabrera observed Alejandro walking down the street nearby and Anna confirmed it was him.  Alejandro was wearing an orange long-sleeve shirt and jeans.  He had wrapped himself in a light-colored blanket with a pattern on it.  The blanket completely concealed his right arm and hand.  Alejandro held a cell phone in his left hand.

Officer Ippel called for additional units to respond.  Officer Trevin Janser, who usually was partnered with Officer Ippel, detected stress and concern in Officer Ippel's call for assistance and hurried to the scene.  Officer Janser was aware of a call on the previous day in the same neighborhood about a man matching the clothing description of Alejandro walking along the canal carrying a firearm with an extended magazine.

Officer Cabrera gave several commands to Alejandro to stop, and Officer Cabrera shouted to Alejandro to sit down, show his hands, drop what he was holding, "talk to us," and "set it down."  Alejandro looked at the officers and made eye contact with Officer Cabrera, but he did not stop walking and did not drop his phone or the object in his right hand.[3]  Officer Ippel drove ahead of Alejandro in order to block his movement.  Alejandro then turned and walked back toward Officer Cabrera until he was about 10 to 15 feet from him.  The officers continued to give commands for Alejandro to stop, drop the sheet, and show his hands as well as telling Alejandro that he was under arrest, and he was not going anywhere.

Alejandro did not verbally respond.  He turned and went down a short alley to a canal that ran East to West.  Officers Cabrera and Ippel were concerned because they could not see Alejandro's right arm, and he was not obeying their commands.  Alejandro kept putting his hands forward while his right arm was concealed under the sheet, and, at one point, officers observed the end of a round, black object extend from the end of the sheet.  While the officers could not conclusively identify the object at this time, they believed the object may well have been the barrel of a firearm.

---

[3]  The vehicle public address system was not working, so Officer Cabrera shouted. Alejandro appeared to hear, having turned to make eye contact with Officer Cabrera.

Officers Cabrera and Ippel recognized there was no cover from a firearm in this area, and they allowed some greater distance between themselves and Alejandro.  They also called for additional resources including air support and a police service dog ("K9") unit.  Alejandro kept walking east along the canal and exhibited erratic behavior consistent with a person on methamphetamine.  He continued to point his right arm toward officers from underneath the blanket.  There were points at which, either from the wind or Alejandro's movement, the blanket would open enough that officers saw a black object that appeared to be a small rifle or submachine gun.

Officer Janser arrived in his marked Phoenix Police Department Tahoe.  He initially began to arm himself with a Stun Bag[4] as a less lethal option.  When he learned that Alejandro had an object in his hand that appeared to be a firearm, Officer Janser dropped the Stun Bag launcher and grabbed his department-issued patrol rifle.  Officer Ippel moved to the driver seat of the Tahoe.  Officer Janser was standing by the driver side door next to Officer Ippel.  Officer Cabrera directed Brody Wiley, a citizen observer riding with Officer Janser, to get out of the vehicle and head west.  Officer Cabrera then took a position near the passenger side door.  Other officers began arriving and taking containment perimeter positions in order to keep Alejandro confined to the canal area.

Officers were concerned with the proximity of a nearby elementary school, playground, and school gardens, as well as two homeless individuals in the area.  At one point, Alejandro had pointed the firearm at officers and appeared ready to fire.  Officer Janser observed this, and would have fired at Alejandro at that point, but Officer Janser refrained from firing his patrol rifle to stop Alejandro because the two bystanders were in the backdrop.  Officers were yelling at the bystanders to get out of the area, and they began moving away.  Officer Cabrera continued to give commands to Alejandro, but he would not verbally respond.  Instead, he continued to move as though manipulating the weapon, stood up a piece of plywood, and then went to a construction

---

[4]  A "Stun Bag" is a type of less lethal projectile that is fired from a shotgun.

COP-HERNANDEZ002838

tractor and attempted to gain access inside the cab.  As Alejandro was looking around the tractor, he pointed the gun at the officers again.

Sergeant Kipper returned to the scene and was then positioned behind Officer Janser's Tahoe.  Sergeant Kipper spoke with Officer Janser to ask whether Officer Janser would shoot Alejandro if he pointed the gun at them again.  Alejandro moved toward a fence.  Once he got to the fence, he knelt down and began manipulating the gun.  He then stood up and again pointed the gun at officers.  When he pointed the gun at officers this time, he raised it up to his cheek in a two-handed grip in the manner one would typically aim and use a short-barreled rifle.  Officer Cabrera reported that when Alejandro pointed what Officer Cabrera believed to be a gun at him, he felt threatened and was in fear for his life and the lives of others in the surrounding area. Officer Lilly reported a similar fear.  When he saw Alejandro pull his gun up to his face and aim the gun directly at the patrol vehicle, Officer Lilly believed that Alejandro was going to shoot at them, and he ducked behind the passenger door of the patrol vehicle directly behind where Officer Janser was positioned.

Officer Janser fired one shot from his rifle, striking Alejandro.  Alejandro bent over and then stood back up with the gun still in his hands.  Officer Janser fired four more rounds until Alejandro went to the ground where the gun laid underneath him.  Officers coordinated their approach, using a K9 and a bunker[5] to move Alejandro away from the gun and take him into custody.  Officers then requested medical treatment for Alejandro, and he was transported to a local hospital where he succumbed to his injuries.

---

[5] A "bunker" is a commonly-used term for a ballistic-rated shield used for temporary, mobile protection against some lethal threats, including bullets fired into the shield.

COP-HERNANDEZ002839

**Discussion and opinions:**

a.    **The use of force by Officer Janser was reasonable and consistent with generally accepted police training, policies and practices.**

1.    Alejandro Hernandez's behavior caused a significant concern that he would become violent and harm others.  His sister, Anna Hernandez, had obtained an Order of Protection because of Alejandro's aggression and physical violence toward her, resulting in Alejandro's arrest for domestic violence-related charges. Anna reported (and police verified) that the Order of Protection included her parents' address of 1211 North 33rd Street and her parents as protected persons. Upon Alejandro's release from jail earlier in the year, he had gone to stay at this address.  Alejandro's family had become increasingly concerned about Alejandro's methamphetamine addiction and his erratic, violent behavior while under the influence of methamphetamine.[6]  They contacted Alejandro's probation officer and requested that Alejandro be required to move to a halfway house. Alejandro eventually moved to a halfway house where he stayed for a few weeks. On April 27, 2019, Alejandro told his father he would not return to the halfway house.  The family and probation officer were later notified Alejandro had not returned, and the family did not hear from Alejandro until two days later.

2.    Anna said that Alejandro had been getting "worse and worse" since February, and she was concerned for her parent's safety.  Anna felt Alejandro had "given up."

---

[6] I am familiar with many persons who were contacted by police while the subject was under the influence of methamphetamine.  Officers are taught and know from experience that methamphetamine users are very often wildly unpredictable in their behavior, escalating to violence without any apparent cause or warning.  Methamphetamine users frequently resist arrest with great violence, seemingly impervious to pain from control holds and TASER® electronic control device use.  I have fought to control a person under the influence of methamphetamine and was shocked at the physical strength of the slightly built person; the extraordinary strength apparently a result of the chemical stimulant.  Countless officers report similar experiences with persons who have consumed methamphetamine.

**COP-HERNANDEZ002840**

Anna and her family continually ascribed Alejandro's behavior to his use of methamphetamine.  At no time did they tell officers that Alejandro was suffering from any mental health condition whether diagnosed or undiagnosed.  Anna later stated Alejandro was unable to receive a professional analysis of his mental health state due to his persistent drug use.  Her sister, Guadalupe Hernandez, said that Alejandro was constantly paranoid and thought people were always following him, but he had never been diagnosed with any type of mental health illness. While Anna told officers that Alejandro did not carry a gun, she had not spoken to him in a year and, in fact, had not interacted with him at all on April 29, 2019. Anna later acknowledged that she knew of times where Alejandro had possessed a gun.  Guadalupe told officers that Alejandro used methamphetamine and that Alejandro had previously owned a handgun.  Though Anna may have believed Alejandro did not have a gun on April 29, 2019, the day of this incident, she had no factual basis to support her belief.

3.    Officers had probable cause to make a custodial arrest of Alejandro Hernandez. Officers were called to the residence listed on the Order of Protection to investigate a violation of a valid Order of Protection.  Phoenix Police Dispatch told responding officers over the radio there was an Order of Protection, and Officer Ippel verified the Order through the computer records.  Family members told police Alejandro had been inside the residence at 1211 North 33rd Street, which is a violation of the Order of Protection and constitutes the crime of interfering with judicial proceedings under Ariz. Rev. Stat. § 13-2810 and is a Class 1 misdemeanor.  Officers observed Alejandro near the residence at 1211 North 33rd Street, which is also a violation of the Order of Protection and constitutes the crime of interfering with judicial proceedings under Arizona Rev. Stat. § 13-2810.  Family members told police they believed Alejandro was high on

methamphetamine, and they expressed their desire to have him arrested for the safety of their family and the community.  Alejandro did not respond to officers' lawful commands and took measures to avoid arrest.  Further, Alejandro was observed in possession of a weapon and demonstrated an intent to use it against officers and possibly against others in the vicinity.

4.     A reasonable and well-trained officer, aware of the information known to or reasonably believed by Officer Janser, would have concluded that Alejandro posed a significant risk of violence that could result in serious injury or death to officers and to bystanders.  Alejandro demonstrated significant risk factors for committing and continuing to commit violence which are known to police officers, including:

a.     Walking away from the officers after being instructed to stop.

b.     Failing to engage verbally with the officers.

c.     Ignoring the officers' reasonable and lawful commands, including the command to drop what he was holding.

d.     Exhibiting agitated behaviors.

e.     Attempting to access a construction tractor.

f.     Hiding his right arm, right hand, and what appeared to be a weapon beneath a blanket.

g.     Manipulating what appeared to be a firearm.

h.     Pointing what appeared to be a firearm at the officers.

5.     A reasonable and well-trained officer would have believed that the weapon used by Alejandro presented a lethal threat.  The replica gun had dimensions and features consistent with a functional firearm.  The replica was covered with black electrical tape and a black cloth.  The black cloth was at least partially secured with a blue, removable tape.  By covering the gun with black materials, it made it

COP-HERNANDEZ002842

more difficult to discern it as a replica and more identifiable as a functional firearm.  Additionally, the replica gun had been outfitted with a sling.  Firearms slings are rarely used on replica or toy firearms and are more commonly associated with a functional firearm.  This would further cause a reasonable and well-trained officer to believe Alejandro was wielding a functional firearm.

6.   Officer Janser utilized a Leupold Mark 4 CQ/T optic (scope) on his rifle to attempt to identify the nature of the weapon.  The optic is capable of magnifying a view three times larger than normal.  Officer Janser was 347 feet from Alejandro at the time that he viewed Alejandro and the weapon through the optic.  At full magnification, Officer Janser would have been viewing Alejandro from a perceived distance of nearly 116 feet.  Officer Janser did what was safe and reasonable to determine what Alejandro was wielding.

7.   Multiple officers confirmed believing the firearm was real.  At one point, Officer Ippel broadcast over the radio the firearm may be an "airsoft replica, but I'm not sure."  Officer Ippel also identified the firearm as a small rifle and believed Alejandro was moving objects in the field to set up a platform to shoot at officers.  Officer Ippel stated he believed that other officers' and his life and safety were in jeopardy.  All other communications and actions regarding the firearm demonstrate that the officers believed the firearm was functional and capable of causing serious bodily injury or death if Alejandro fired it.  Multiple officers reported ducking behind vehicles when Alejandro pointed the firearm at them, believing he was about to fire and that they and/or others could be killed or injured.  Their urgent evasive action corroborates the officers' statements that they believed Alejandro was in possession of a functional firearm.  The replica firearm was modified to make it look more like a functional firearm by wrapping it in black tape and black cloth while also affixing a sling to the weapon.  Alejandro

was holding the weapon and attempting to manipulate it as though it were a functional firearm.  A reasonable and well-trained officer, with the information available to officers at the time, would believe Alejandro possessed a functional firearm.

8.  Only a sliver of a second is required for a person holding a gun to move it into an effective firing position.  A maxim of weapons training is that "action always beats reaction."  Officers are taught, and much sad experience has proven, that a subject holding a gun can shoot without warning - always beating the officers' reaction ability.  This can happen at any time during an interaction with an armed subject regardless of the amount of time officers interact with that subject.  Even though Alejandro had not previously fired his weapon, Officer Janser perceived that he was about to be shot, perhaps fatally, and that his fellow officers and others in the area, including children, could also be shot, perhaps fatally.  A reasonable and well-trained officer would reach the same conclusion in the same circumstances.  Presented with Alejandro brandishing and aiming a deadly firearm, a reasonable and well-trained officer would recognize that the officers and others present were facing an imminent threat of death and/or serious bodily injury.

9.  Sergeant Kipper asked Officer Janser whether, if Alejandro pointed the gun at the officers again, Officer Janser intended to shoot Alejandro.  Officer Janser replied that he would, depending on the backdrop.  Officer Janser was conscientious about the backdrop and the presence of other persons throughout the entire incident.  Officer Janser had notified other officers of his team's positions and warned the other officers about potential crossfire situations.  He stated that when Alejandro pointed the gun at his team once again, he feared for the lives and safety of his fellow officers, persons who may have been at the school, other

persons in the neighborhood, and for his own life and safety. The conversation between Sergeant Kipper and Officer Janser was consistent with reasonable tactical planning. Officer Janser's statements and actions show that he made an independent determination to use defensive deadly force and to shoot Alejandro based on Officer Janser's reasonable fear of a deadly threat presented by Alejandro.

10.     At the time that he fired his rifle at Alejandro, Officer Janser was in fear for his life and the lives of others in the area, including passers-by, persons in the residential neighborhood along the canal, and anyone who might be at the elementary school, or playground, or school gardens. A reasonable and well-trained officer, aware of the information known to Officer Janser, would have believed that deadly force was necessary to counter the deadly threat presented by Alejandro Hernandez. Any rational person would have been. In the very epitome of a situation that was tense, uncertain and rapidly evolving, a reasonable and well-trained officer would have made the decision to shoot Alejandro to prevent him from shooting the officers and others in the area.

11.     Officer Janser fired one shot from his rifle, striking Alejandro. Alejandro bent over and then stood back up with the gun still in his hands, demonstrating that Alejandro still had the physical ability to move and to manipulate his weapon. Alejandro had already demonstrated multiple times that he was willing to point the weapon at officers. Even though he had been shot one time, he still gripped the weapon in his hands. A reasonable and well-trained officer would not wait until the barrel of a gun is pointed at another person or themselves to reasonably perceive an ongoing imminent threat of serious bodily injury or death. Officer Janser reasonably perceived that Alejandro still presented a credible threat as he

COP-HERNANDEZ002845

moved to rise up again still holding his gun.[7]  A reasonable and well-trained officer observing Alejandro's action after he was struck by a single bullet would recognize that he continued to pose a deadly threat.

b.    **The officers attempted to de-escalate the situation.**

1.    "De-escalation" in the policing context does not yet, and may never, have a unitary definition.  To some, de-escalating simply means slowing down a response.  To others, de-escalation may mean trying to calm tense situations or emotionally aroused persons.  Many incorrectly assume that de-escalation training has only to do with training officers to manage heightened emotional responses when encountering a tense situation.  David Griffith defines de-escalation in the policing context as "the result of a combination of communication, empathy, instinct, and sound officer safety tactics."[8]

2.    De-escalation does not mean that public safety is not the top priority in responding to disturbance calls, order of protection violations, and similar domestic violence events.  In fact, many experts assert that de-escalation cannot begin to happen without tactical superiority.  De-escalation is not a self-contained technique.  There is nothing new about officers de-escalating crises.  Street cops and corrections officers have been calming bar fights, quelling jail disturbances, talking subjects into handcuffs and soothing domestic battles for decades.  In most cases, officers skilled at de-escalation did not have any specialized training, instead they intuitively practiced the principles now articulated in contemporary

---

[7]  Methamphetamine is a powerful stimulant.  A subject under the influence of methamphetamine may receive multiple injuries, including multiple gunshots, and still be violent.  I am personally familiar with a subject under the influence of methamphetamine who easily fought through the effects of a TASER device and was shot many times before ceasing to fight.

[8]  D. Griffith, "De-Escalation Training: Learning to Back Off," *POLICE Magazine*, Mar. 2, 2016.

**COP-HERNANDEZ002846**

de-escalation training.  Officer Janser was specifically trained to negotiate and to

de-escalate, and he had received training in communication in volatile incidents.

3.      Officers are trained to be particularly cautious when dealing with domestic

violence crimes.  Historically, calls related to domestic violence-related incidents

consistently represent the highest number of calls for service where police officers

are killed and are also the leading underlying cause of law enforcement fatalities

for several other related categories of calls for service.[9]  Federal Bureau of

Investigation Law Enforcement Officers Killed in Action data for 2020 (the most

recent complete data set available) shows that more law enforcement officers were

shot responding to domestic violence calls than any other type of firearm-related

death.  In the past thirty years, nearly 150 officers were killed while responding to

domestic violence disturbances.  Officers are presented with facts such as these as

part of training related to domestic violence investigation and are trained to

recognize the particular dangers involved in domestic violence calls.

4.      Whether a CIT-certified officer is present or an officer trained in de-escalation

techniques is at the scene, a fundamental principle of law enforcement is that

de-escalation through any method requires certain precedent conditions.  As

taught in the CIT course, CIT is not for acute volatile situations.  Virtually all

de-escalation training programs note that some form of control is essential before

de-escalating.[10]  Discussions and prescriptions of de-escalation have largely

happened outside of an evidence-based approach.  There is much that we have yet

---

[9]  N. Bruel, M. Keith, *Deadly Calls and Fatal Encounters: Analysis of U. S. law enforcement line of duty deaths when officers responded to dispatched calls for service and conducted enforcement* (2010-2014), pp. 4, 15, National Law Enforcement Officers Memorial Fund (2016).

[10]  *See, e.g.*, V. Kliem, *Four Conditions for Effective De-Escalation*, https://www.lexipol.com/resources/blog/4-conditions-for-effective-de-escalation/ May 20, 2020. Kliem defines the tactical prerequisites to de-escalation as containment, control, contact, and communication.

to learn about what de-escalation means and best practices for de-escalation. De-escalation does not mean not pursuing reasonably achievable safety in a contact.

5.  Officer Janser was well-trained in dealing with emotionally disturbed persons. He successfully completed the Phoenix Police Department Crisis Intervention Team Training and was a Crisis Intervention Team ("CIT") certified officer. CIT is a comprehensive police officer training program initially developed in Memphis through the work of the University of Memphis and Memphis Police Department law enforcement professionals to assist officers in dealing with emotionally disturbed and mentally ill persons. The optimal course consists of a one-week intensive program complete with a field practicum involving persons with lived experience who volunteer to assist with the training experience. CIT nationwide best practices prescribe that CIT serves as an adjunct community response for non-acute circumstances. Most CIT programs are focused on facilitating pre-arrest alternatives to incarceration and diversion from emergency medical services for persons who are mentally ill and/or emotionally disturbed and who do not present an immediate danger or some substantial criminal action. Officers are commonly taught that CIT intervention is not appropriate for volatile scenes. Officers are taught that the immediate task is resolving the threat element before any therapeutic intervention work can be considered. Given the primary focus of providing an alternative to incarceration or emergency medical care, even then a CIT intervention may not be prescribed until the situation is controlled.

6.  CIT training emphasizes the need for safety and control of a scene before attempting therapeutic intervention. Officers are taught that it is a myth that the emotionally disturbed and mentally ill are uniformly harmless and docile.[11]

---

[11] *See* Van Dorn, R., Volavka, J., & Johnson, N., *Mental disorder and violence: Is there a relationship beyond substance use?* Social Psychiatry and Psychiatric Epidemiology, 47,

COP-HERNANDEZ002848

Officer Janser had been commended on several occasions for his ability to use CIT skills to communicate with persons in crisis.

7. Officer Janser and the other officers employed several techniques commonly taught in de-escalation courses in their efforts to de-escalate Alejandro's irrational and agitated behavior throughout the encounter.  Their tactics included maintaining distance as much as reasonably practicable, requesting additional officers and specialized resources (i.e., K9, air support), designating officers to specific tasks such as giving verbal commands, obtaining less lethal tools, obtaining a ballistic shield for lethal cover, and calling Alejandro by name. Addressing a subject by name can lead to a rapport with him and may help to keep the subject grounded.

8. De-escalation is exceedingly difficult, if not impossible, unless the subject is able and willing to engage in dialogue with an officer.  Dialogue may not be possible, or may be much less effective, when the subject is impaired by the influence of alcohol or drugs and/or mental or emotional barriers.  Despite reasonable directions and commands and reasonable efforts to communicate from Officer Janser and the other officers, Alejandro chose a course of action that rendered de-escalation efforts ineffective.

c. **The use of a police service dog to control Alejandro and secure his gun was reasonable and consistent with generally accepted police training, policies, and practices.**

1. Once Alejandro was on the ground, with his gun underneath him, the officers were uncertain whether he had been hit by rounds fired or if he was feigning injury.  They requested a police service dog to respond to the scene and to approach Alejandro.

---

487-503 (2012).

*Hernandez, et al. v. City of Phoenix, et al.*
*Report of Kenneth R. Wallentine*

16

COP-HERNANDEZ002849

2.      Officer Daniel Bill and his police service dog Lumpi carefully approached Alejandro, assisted by Officer Bryan Welsh, Sergeant Justin Prewitt, Officer Keith Backhaus, Officer Steven Hawes, and Officer Stephen Cullen.  Officer Welsh drove a patrol vehicle along the canal to provide cover for Officer Bill and his dog.  The other officers moved with them while holding a bunker to move Alejandro away from the gun and take him into custody.  Officers then requested medical treatment for Alejandro.  Once the officers were close enough to Alejandro that Officer Bill could send his dog tethered with a 50-foot line to Alejandro, Officer Bill directed his dog to approach him.

3.      The dog first bit Alejandro's left thigh, but quickly transitioned to a bite on his left arm.  At that point, the officers cautiously approached Alejandro.  Officer Bill controlled Alejandro by placing his right foot on Alejandro's back and rolling him enough to allow Officer Welsh to grab the gun and remove it.  Once the gun was removed, officers called for medics to assist.

4.      The fact that Alejandro's right hand was tucked under him, and his gun was under his body and not visible, would reasonably cause great concern and alarm for officers in similar circumstances.  There is perhaps no instruction more frequently and emphatically taught to police officers, recruit and veteran officers alike, than the necessity to watch the hands of subjects.  Based on the information known or reasonably believed by Officer Bill and the other officers, a reasonable and well-trained police service dog handler would use a police service dog to bite Alejandro to control his movement long enough to secure his gun and place his hands in handcuffs.  Using police service dog Lumpi in this manner was consistent with generally accepted police training and practices for police service dog deployment.

d.    **The tactics used for medical assistance were reasonable and consistent with generally accepted police training, policies, and practices.**

1.    Officers called for medical assistance from the Phoenix Fire Department immediately following the shots being fired.  Alejandro was still laying on top of the gun and officers could not deem the scene secure for medical to come in.

2.    Phoenix Police Officer Robert Baraban immediately requested the Phoenix Fire Department to stage at the nearest safe entry point at 40th Street and Van Buren Street.

3.    Once Alejandro was handcuffed and the weapon secured, officers immediately requested medical assistance to come into the scene to render aid.  Officers continued to advise of their need for medical assistance and provided access routes into the scene to expedite the medical response.

4.    Officers are taught that the first priority at a law enforcement incident is to ensure the scene is secured against threats to life and safety before moving to other duties, including emergency medical services.  Officers are unable to anticipate the availability and response time of emergency medical services.  It is common practice to call for emergency medical services once it is deemed necessary in order to have them assigned to the incident.  This further allows officers to identify a medical staging point nearby to reduce the time needed before medical treatment can be administered.  It was approximately nine minutes from the time of the shots being fired to when officers were able to safely secure the scene.  The nearest Phoenix Fire Department stations are approximately four and six minutes away from the staging area respectively.  Nothing in the records indicate it would have impacted the outcome by having emergency medical services stage sooner.  The officers' coordinated efforts were reasonable in providing medical assistance in a timely manner consistent with sound tactics and the safety of the public, officers, and medical personnel.

**COP-HERNANDEZ002851**

e.   **The training and supervision of Officer Janser was consistent with generally accepted police training, policies, and practices.**

1.   Officer Janser was a well-trained and qualified law enforcement officer.  The Phoenix Police Department hired Officer Janser as a Police Recruit in February 2007.  He was promoted to Police Officer in October 2007, following completion of basic police academy training.  Throughout the course of his service as a Police Officer, Officer Janser received positive, regular performance evaluations, with many laudatory comments from his supervisors.

2.   I have reviewed the training records for Officer Janser.  I am generally familiar with Arizona Peace Officer Standards and Training-approved curricula for police officer basic training.  Officer Janser successfully completed basic law enforcement training and a substantial number of additional training courses as a Phoenix Police Officer.  Officer Janser achieved initial peace officer certification by completion of all required training and examinations, and he continues to maintain certification by the Arizona Peace Officer Standards and Training Board ("POST") through compliance with annual required training.  The Phoenix Police Department provides a robust in-service training program that exceeds national practices for police training.  The Phoenix Police Department is nationally accredited by the Commission on Accreditation for Law Enforcement Agencies (CALEA).  The accreditation standards include requirements for best-practice training programs.

3.   Officer Janser had been certified to carry a patrol rifle since August 2009.  In addition to the basic police training on use of force taught at part of the mandatory Arizona POST Basic Training Course, Officer Janser had successfully completed a number of in-service training courses that discussed use of force and force decision making.  Such courses included Use of Force Review (on several occasions), Active Shooter Intervention, Patrol Tactics and Force, Small Team

COP-HERNANDEZ002852

Tactics Utilizing Triangulation, Contact and Cover, Patrol Ballistic Shield Operations, Tactical Scenarios, and many periodic requalification courses for use of the Stunbag Shotgun, Patrol Rifle, Handgun, Firearms Decision Making, and TASER.  He regularly successfully completed the required patrol rifle recertification and qualifications courses.  His performance history notes: "you have maintained your police carbine proficiencies at the highest level."  Officer Janser had never fired his police rifle in the line of duty prior to this incident, a testament to his restraint in the use of force and the tactical skills for which his supervisors frequently commended him.

4.     The Arizona Peace Officer Standards and Training curriculum, with which I am personally familiar on a current and a historical basis, consists of training generally regarded by police accreditation agencies throughout the United States as being adequate and proper police training for a police officer.  The Arizona POST Academy basic training program provides a curriculum that is substantially like programs offered throughout the nation and recognized as providing the essential pre-service training for police officers.  The Arizona Peace Officer Standards and Training Board is statutorily charged with establishing training requirements for Arizona's peace officers.  Each officer must complete a Basic Peace Officer Course with a minimum of 585 hours of prescribed training. Trainees must successfully complete all the academy requirements and pass a Comprehensive Final Examination to become certified as an Arizona Peace Officer and be eligible for employment with an Arizona law enforcement agency. Additionally, each Arizona peace officer must complete annual in-service training prescribed by the Arizona POST.

5.     Officer Janser held active certifications as a trained law enforcement officer issued by the Arizona Peace Officer Standards and Training Board at the time of this incident.  The Phoenix Police Department could reasonably rely upon Officer

Janser's status as holding an active POST certification to indicate that he had been properly trained under Arizona Peace Officer Standards and Training Board's physical, mental, and moral fitness standards and that he completed basic peace officer training curriculum.  Moreover, their continuing status as an actively certified peace officer indicated that Officer Janser was not subject to any disciplinary action by the Arizona Peace Officer Standards and Training Board for any misconduct.

II.     In reaching my opinions in this matter I have relied upon my training and experience in public safety acquired throughout my career.  A summary of my qualifications, publications, litigation history and fee schedule are recited herein.

III.     **My qualifications as an expert in this subject matter include the following:**  I am a law enforcement officer in the State of Utah.  I became certified as a law enforcement officer in the State of Utah in 1982.  I am the Chief of the West Jordan (Utah) Police Department, where I oversee all police operations and investigations.  I am the Chair of the Governing Board of the Officer-Involved Critical Incident Investigations Teams in Salt Lake County, Utah.  I was formerly employed with the Utah Attorney General, where I served as the Chief of Law Enforcement.  After a period in private practice, I was employed as a Special Agent with the Utah Attorney General Investigation Division, where I coordinated a statewide use of force training initiative and coordinated officer-involved shooting investigations and other special investigations.  I also serve in a consultation role as Senior Legal Advisor for Lexipol, the nation's leading provider of law enforcement risk management resources.

I was formerly employed as a Bureau Chief at the Utah Department of Public Safety, Peace Officer Standards and Training Division, where I supervised investigations into allegations of improper and excessive force, officer integrity, and criminal acts alleged to have been committed by law enforcement officers and supervised in-service training administration and certification for all peace officers in the State of Utah.  I also supervised the police service dog

**COP-HERNANDEZ002854**

training and certification program for the State of Utah.  I had responsibility for policy drafting and review for the parent agency, the Utah Department of Public Safety.

My duties included direct supervision and command of various investigative units and agents throughout the State of Utah, supervising law enforcement officers, forensic specialists, and technicians.  I commanded the State of Utah Child Abduction Response Team.  I commanded the State of Utah Officer-Involved Fatality Investigation Team.  I am a member of the Board of Review of the Utah Technical Assistance Program, consulting in cold case homicide and complex violent person crimes investigations.  In 2010, Governor Herbert selected me for the Governor's Leadership in Public Service award for my work in public safety leadership.

IV.    I currently serve on the Use of Force Standards and the K9 Standards Committees of the Utah Peace Officer Training and Standards Division, articulating the standards for use of force by police officers and deployment of police service dogs.  I was formerly responsible for providing delivery of the Basic Training Curriculum related to all legal subjects, as well as certain tactical subjects, at the Utah Law Enforcement Academy.  I continue to teach at the Utah Law Enforcement Academy.  I am the author of the police academy curriculum currently in use for several subjects, including, but not limited to, use of force, reasonable force, use of force and police service dog teams, search and seizure, search and seizure for police service dog teams, and use of force/firearms instructor liability.  I am certified by the Force Science Research Center as a Realistic De-Escalation Instructor, a course certified by the International Association of Directors of Law Enforcement Standards and Training.  I am a certified POST Firearms Instructor, and often served as the lead instructor for POST Firearms courses.  I am certified by the Force Science Research Center as a Force Science Analyst® and an Advanced Force Science Specialist®.  I am a former certified TASER® Instructor.  I am a certified Excited Delirium and Sudden Death Investigation Instructor.  I was certified by the Los Angeles Police Department in Officer-Involved Shooting Investigation.  In 2011, I was certified by the Institute for the Prevention of Sudden In-Custody Death as an instructor in restraint systems.

COP-HERNANDEZ002855

V.      I am a licensed attorney, having practiced law since 1990.  I am admitted to practice

before the United States Supreme Court, the Courts of Appeals for the Fifth and Tenth Circuits,

and the State and Federal courts in the State of Utah.  I am a former Chief Deputy County

Attorney and a former Utah Attorney General designated prosecutor.  I am a Master of the Bench

of the American Inns of Court, Inn One, where I also serve as the past-President of the Inn of

Court.  I serve as an Administrative Law Judge for the State of Utah and for various counties and

cities in Utah, providing hearing officer and appellate hearing services for hearings involving

allegations of police officer misconduct for a variety of state agencies and municipalities.  I was

formerly on the faculty of Excelsior College, teaching Criminal Procedure, Evidence and

Management Strategies for Public Safety.

VI.     In addition to my primary employment, I consult and provide expert witness opinions on

police procedures, and use of force issues.  I occasionally perform in-custody death investigations

and officer-involved shooting death investigations for agencies which may lack the requisite

expertise.  I have served on several International Association of Chiefs of Police Policy Center

working groups and presently serve on the Search Warrants policy working group.  I am a

consultant to the Utah Risk Management Mutual Association, the state's largest insurer of public

safety agencies, on matters of officer conduct and discipline, hiring and screening practices, use

of force, and police pursuit policies.  I am the co-founder of a best practices advisory group that

developed comprehensive model policies and best practices under the authority of the Utah

Chiefs of Police Association, the Utah Sheriffs' Association and various state law enforcement

agencies.  These policies serve as a model for all Utah public safety agencies.  I am the author of

a number of model policies for law enforcement agencies, and have provided policy drafting and

policy review services for several agencies, including policy drafting responsibility for large law

enforcement agencies.  I have served as a contract consultant to the United States Department of

Justice, assigned to provide technical assistance and management consulting to various public

safety entities in the United States.

**COP-HERNANDEZ002856**

VII.     I participate and serve in a number of community and professional capacities.

Professional activities pertinent to law enforcement include serving as the president of the Utah

Chiefs of Police Association.  I am a member of the Board of Governance of the Statewide

Information and Analysis Center, Utah's unified intelligence fusion center.  I represent the Utah

Chiefs of Police Association on the League of Cities and Towns Listen, Love, Learn Task Force,

creating strategies for police reform and relations with communities of color.  I am a founding

member of First Steps to More Trust, an initiative to join young persons in the BIPOC

community with young public safety professionals in leadership training and community

engagement.  In 2021, I was recognized by D.A.R.E. America as the "Law Enforcement

Executive of the Year."  In 2022, I was named as the "Utah Police Chief of the Year" by the Utah

Chiefs of Police Association.  Also in 2022, upon nomination of the Attorney General, I was

named as the "Utah Public Safety Officer of the Year" by the Utah Best of State Foundation.  I

am the Chair of the Governing Board of the Officer-Involved Critical Incident Investigations

Teams in Salt Lake County, Utah, and have direct command of Officer-Involved Critical Incident

Investigations Team IV.  I am Vice-Chair of the Salt Lake County Law Enforcement

Administrators and Directors Association.  I am a member of the Board of Directors of the

Institute for the Prevention of Sudden In-Custody Death, member of the Board of Advisors,

Association of Force Investigations, member of the International Association of Chiefs of Police

and the Utah Chiefs of Police Association, member of the National Tactical Officers Association,

former member of the International Association of Law Enforcement Firearms Instructors,

member of the United States Police Canine Association, former member of the Board of

Directors of Crisis Intervention Team Utah, Past-President of the Utah Peace Officers

Association, former Board Member of the Utah SWAT Association, past member of the board of

directors of the NAACP, Salt Lake City branch, and board member of the Utah Law Enforcement

Legislative Committee.  I formerly served as a gubernatorial appointee to the Council on Peace

Officer Standards and Training.  I am a former member of the Scientific Working Group on Dog

and Orthogonal Detector Guidelines, a national scientific best practices organization sponsored

COP-HERNANDEZ002857

by the Federal Bureau of Investigation, the Department of Homeland Security, and the Transportation Security Administration, with support coordinated by the International Forensic Research Institute at Florida International University.  I have been a presenter at a variety of professional conferences and seminars, including presenting on use of force training at the annual convention of the International Association of Chiefs of Police and the International Conference of the Institute for the Prevention of Sudden In-Custody Death.

VIII.    From 1994 to 2014, I was a consultant with the K9 Academy for Law Enforcement and the International Police Canine Conference.  My principal responsibilities included providing use of force training, civil liability instruction, and search and seizure instruction.  I am a former police service dog handler, having been assigned to work with a dual purpose patrol and drug detector police service dog.  I have provided police service dog training and certification standards consultation for two police service dog organizations, including a western regional group and one of the major national groups.  I serve as a consultant for the California Narcotic and Explosive Canine Association and have been a featured lecturer at their annual training conferences over the past decade.

IX.    I am a Senior Legal Advisor for Lexipol.  In that capacity, I have assisted in the drafting and review of use of force, use of police service dogs, and other policies in current use by more than 3,300 public safety agencies in the United States.

X.    **My publications (limited to ten years) include the following:**  I have previously published a number of other professional articles, many of which have been subjected to peer review.  My most recent book, *Preparing for an Active Shooter Threat*, was published in June 2020 by Blue360 Media.  Another book, *Street Legal: A Guide to Pre-trial Criminal Procedure for Police, Prosecutors, and Defenders*, 2nd edition, was published in 2020 by the American Bar Association Publishing Division.  *The K9 Officer's Legal Handbook*, 3rd ed., was published in February 2019.  My other published works include:  *An Outward Mindset Powering Multicultural Policing,* Police Chief, V. 89, No. 4 (2022); *Mitigating Suicide Threat Response Risks*, Police Chief, V. 86, No. 3 (2019); *Avoiding a Peer Support Pitfall*, Police Chief, V. 85,

**COP-HERNANDEZ002858**

No. 3 (2018); *Should I Stay or Should I Go?*, POLICE, October 2017, *Hill v. Miracle: Adapting the Graham Standard to Non-Criminal Interventions*, Police Chief (August 2017): 18–19; *Armstrong v. Village of Pinehurst: Training and Policy Implications for Police*, Police Chief, V. 83, No. 6 (2016); *Supreme Court Decision Casts Doubt on Hotel Registry Ordinances*, Police Chief, V. 81, No. 10 (2015); *Body Worn Cameras: Plan Before Your Office Buys In*, The Sheriff (June 2015); *Legal Risks of Failing to Care for Children of Arrested Persons*, Police Chief, V. 81, No. 10 (2014);  *A Rational Foundation for Use of Force Policy, Training and Assessment*, 2014 (2) AELE Mo. L. J. 101; *Post Incident Video Review*, Police Chief, V. 68, No. 12 (2011); *Cell Site Location Evidence: A New Frontier in Cyber-Investigation*, 2011 (2) AELE Mo. L. J. 501.

XI.     **My fee schedule (through December 31, 2022) is established as follows:** I charge $300.00 per hour for examination of reports and documents, site visits, interviews, administrative tribunal, deposition or court testimony, with a minimum of $1,200.00 for deposition or court testimony.  I bill for actual travel expenses and a travel fee of $1,200.00 per day/part-day for travel to western states and $1,800.00 per day/part-day outside western states.

XII.    **My prior experience as an expert witness (limited to the past four years) includes the following cases:**  I have been qualified as an expert in the subject matter of police procedures, including use of TASER® devices, police use of force, shootings and wrongful death claims, search and seizure, police service dog use, both in drug detection and dog bites, and I have never had a court decline to find that I am a qualified expert witness.  I have testified and/or provided depositions and trial testimony in the following cases which may be generally related to the subject of the instant litigation in the past four years: *Castro v. State of Arizona*, Case No. 2:18-cv-00753-SRB, United States District Court for the District of Arizona, 2019.  Trial testimony given on behalf of defendants.  Subject matter: police use of force.  *Glass v. Robinson*, No. CV-19-04883-PHX-SMB, United States District Court for the District of Arizona, 2022. Trial testimony given on behalf of defendants.  Subject matter: police use of force.  *Celestin v. City of Ocoee*, NO: 6:21-cv-00896-RBD-EJK, United States District Court for the Middle

COP-HERNANDEZ002859

District of Florida, 2022.  Deposition testimony given on behalf of defendants.  Subject matter: wrongful death.  *Coleman v. City of Tempe*, No. 2:17-cv-02570 PHX DLR, United States District Court for the District of Arizona, 2022.  Trial testimony given on behalf of defendants.  Subject matter: police use of force.  *Caney v. Gillette, et al.* No. CV 2019-011516, Superior Court of Arizona for Maricopa County, 2021.  Deposition testimony given on behalf of defendants. Subject matter: traffic crash. *Brown v. City of Phoenix*,  No. 2:20 cv 02087 DLR JZB, United States District Court for the District of Arizona, 2021.  Trial testimony given on behalf of defendants.  *Coleman v. City of Tempe*, No. 2:17-cv-02570 PHX DLR, United States District Court for the District of Arizona, 2021.  Trial testimony given on behalf of defendants.  Subject matter: police use of force.  *Khalaj & Youmarin v. City of Phoenix, et al.*, CV-17-01199-PHX-GMS, United States District Court for the District of Arizona, 2021. Deposition testimony given on behalf of defendants.  Subject matter: wrongful detention. *Gomez-Guerrero v. Villafuerte*, No. 20 L 70, 19th Judicial Circuit Court, Lake County, Illinois. Deposition testimony given on behalf of defendants.  Subject matter: wrongful death.  *Bueno v. Howard, et al.*, No. 2:16-cv-03450- DGC-JZB, United States District Court for the District of Arizona, 2021.  Trial testimony given on behalf of defendants.  Subject matter: police use of force.  *Lane v. City of Mesa*, No. 2:19-cv-00852-DJH, United States District Court for the District of Arizona, 2021.  Deposition testimony given on behalf of defendant.  Subject matter: wrongful death.  *Mitchell v. City of Cedar Rapids*, No. LACV087209, Iowa District Court for Linn County, 2021.  Deposition testimony given on behalf of defendant.  Subject matter: wrongful death.  *Johnson v. City of Mesa*, No. 2:19-CV-02827-JAT-JZB, United States District Court for the District of Arizona, 2020.  Deposition testimony given on behalf of defendant. Subject matter: police use of force.  *Ortega v. United States of America*, No. CV-19-08110-PCT-JAT, United States District Court for the District of Arizona, 2020. Deposition testimony given on behalf of defendant.  Subject matter: police custody.  *Peralta v. Arizona Department of Public Safety*, No. CV-17-01868-DJH-BSB,  United States District Court for the District of Arizona, 2020.  Trial testimony given on behalf of defendant.  Subject matter:

COP-HERNANDEZ002860

police custody. *Krakana & Zinn v. City of Scottsdale*, No. CV-17-01813-PHX-JJT, United States District Court for the District of Arizona, 2020. Trial testimony given on behalf of defendant. Subject matter: police tactical operation. *A.C. v. County of Santa Barbara*, No. 2:18-CV-3694 SK, United States District Court for the Central District of California, 2019. Deposition testimony given on behalf of defendant. Subject matter: police use of force. *Smith v. City of Waterloo*, Case No. LACV133172, District Court for Black Hawk County, Iowa, 2019. Trial testimony given on behalf of defendants. Subject matter: emergency vehicle operation. *Mould v. City of Tempe*, No. CV2016-018161, United States District Court for the District of Arizona, 2019. Trial and deposition testimony given on behalf of defendant. Subject matter: wrongful death. *Lawrence v. Las Vegas Metro Police Department*, No. 2:16-cv-03039-JCM-NJK, United States District Court for the District of Nevada, 2019, Deposition testimony given on behalf of defendants. Subject matter: wrongful death. *Webb v. City of Waterloo*, No. 6:17-cv-2001-CJW-MAR, United States District Court for the Northern District of Iowa. Deposition testimony given on behalf of defendants. Subject matter: police use of force. *Charboneneau v. Demings*, No. 2017-CA-010862-O, Ninth Judicial District Court, Orange County, Florida, 2019. Hearing testimony given on behalf of defendants. Subject matter: use of force. *Carsons v. Black Bear Reserve Homeowners Association, Inc., et al.*, No. 35-2015-CA-001910, Fifth Judicial District Court, Lake County, Florida, 2018. Deposition testimony given on behalf of defendants. Subject matter: investigative procedures. *Mould v. City of Tempe*, No. CV2016-018161, United States District Court for the District of Arizona, 2018. Deposition testimony given on behalf of defendant. Subject matter: wrongful death. *McSwain v. United States*, No. 2:15-cv-01321, United States District Court for the District of Nevada, 2018. Trial testimony given on behalf of defendant. Subject matter: negligence. *Rodriguez v. City of West Covina*, No. 2:17-CV-0138 CBM, United States District Court for the Central District of California, 2018. Deposition testimony given on behalf of defendant. Subject matter: police canines. *Mims v. City of Charlotte*, No. 2014-CVS-23815, Superior Court of North Carolina, 2018. Trial and deposition testimony given on behalf of the defendants. Subject matter: wrongful death. *Chastang v. Levy*,

**COP-HERNANDEZ002861**

No. 6:17-cv-00538-0r1-37 DCI, United States District Court for the Middle District of Florida, 2018.  Deposition testimony given on behalf of defendant.  Subject matter: police defensive deadly force.

      The observations and opinions stated herein are based on the materials provided to me for consideration, and are preliminary insofar as additional information may be provided to me through the course of discovery and other incidents of the litigation process.  They are based on the best information presently known to me.  I have assumed the general accuracy of the documents, statements, and reports, excepting those expressed as opinions and those conflicting one with another and/or conflicting with objective evidence, that were provided to me.  The opinions herein may be supplemented and/or revised upon receipt of additional information, including, but not limited to, further deposition testimony, consideration of any report submitted by Plaintiffs' experts, further investigation and/or further witness interviews.  I may supplement this report upon completion of depositions of witnesses in this matter and/or upon being provided with other investigative documents, and/or diagrams, video and photographs.

      My trial testimony may be supported by exhibits that include the pleadings, documents, statements, depositions, diagrams, photographs, and reports listed herein, as well as illustrative evidence such as a visual presentation of computer-generated slides and visual images projected onto a screen, charts, graphs, or illustrations created to better illustrate the aforementioned documents.  The exhibits, testimony aids, or list of references used as a summary of, support for, and/or graphic depiction or illustrative description, summary, or synopsis, for the information, statements, summaries, and opinions in this report specifically include, but are not limited to, each (or any compilation, synopsis, summary, demonstrative, illustration, or graphic) pleading, document, statement, deposition, diagram, photograph/image, report, citation, reference, paper, book, illustration, graphic, chart, drawing, diagram, table, PowerPoint® slide, set, or deck, picture, image, and/or video in this report, referenced or cited in this report, or included in any of the references to this report.  These may be utilized as exhibits, explanatory, or demonstrative aids to support deposition and/or trial testimony, or for any other purpose.  These exhibits

**COP-HERNANDEZ002862**

specifically include any illustrative evidence such as visual presentation of computer-generated slides and visual images projected onto a screen, charts, graphs, or illustrations created to better illustrate the aforementioned exhibits.  I reserve the right to create, use, utilize PowerPoint or other graphics or illustrations, or compilations, as exhibits at deposition, trial, or for any other purpose after submission of this report.

## CONCLUSION

Officer Janser was in fear for his life and the lives of others in the area, including passers-by, persons in the residential neighborhood along the canal, and any who might be at the elementary school, or playground, or school gardens.  A reasonable and well-trained officer, aware of the information known to Officer Janser, would have believed that deadly force was necessary to counter the deadly threat presented by Alejandro Hernandez.  Officer Janser's use of defensive deadly to stop Alejandro's deadly threat was reasonable and was consistent with generally accepted police training and practices.

The use of a police service dog to control Alejandro and secure his gun was reasonable and consistent with generally accepted police training and practices.  Officer Janser and the other officers attempted reasonable de-escalation efforts.  Despite reasonable directions and commands and reasonable efforts to communicate from Officer Janser and the other officers, Alejandro chose a course of action that rendered de-escalation efforts ineffective.

Kenneth R. Wallentine
October 3, 2022

COP-HERNANDEZ002863