WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Justina Hernandez, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>City of Phoenix, et al.,<br><br>    Defendants. | No. CV-20-00767-PHX-GMS<br><br>**ORDER** |

Pending before the Court is Defendants' Motion for Summary Judgment (Doc. 112). For the reasons detailed below, Defendants' Motion is granted.

**BACKGROUND**

This case arises out of the shooting and killing of Alejandro Hernandez on April 29, 2019. Mr. Hernandez had struggled with chronic substance abuse and addiction. (Doc. 113 at 1; Doc. 130 at 14). According to Mr. Hernandez's sister—Anna Hernandez—and parents—Justina and Jose Hernandez—Mr. Hernandez's family sought and received an order of protection against Mr. Hernandez on the advice of Phoenix Police officers. (Doc. 130 at 15). They hoped that if Mr. Hernandez violated the order of protection, he would be arrested and forced into sobriety while in jail. (*Id.*)

On April 29, 2019, at 9:30 a.m., Mr. Hernandez went to his parents' home in violation of the family's order of protection. (Doc. 113 at 3; Doc. 130 at 15). Anna Hernandez called 911 to inform Phoenix Police of Mr. Hernandez's violation. (Docs. 127,

130 at 15-16, 130-7). In her conversation with dispatch, Anna Hernandez informed the operator that her brother was likely under the influence of drugs and was not, to her knowledge, armed with a firearm. (*Id.*). Sergeant Kipper and Officers Ippel and Cabrera were the first officers to the scene, where they found Mr. Hernandez had already left his parents' home with no signs of violence. (Doc. 113 at 4; Doc. 130 at 16). Anna Hernandez claims she spoke with the three officers and repeated that her brother was likely under the influence of drugs and not in possession of a firearm. (Doc. 130-3 at 4). While speaking with Anna, the officers noticed a man with a blanket walking down the street who met the description of Mr. Hernandez; Anna Hernandez confirmed the man was indeed Mr. Hernandez. (Doc. 113 at 4; Doc. 130 at 16).

Officers Cabrera and Ippel followed Mr. Hernandez and told him to stop. (Doc. 113 at 4; Doc. 130 at 16.) Mr. Hernandez did not comply. This continued, with the officers attempting to communicate and Mr. Hernandez continuing to walk, until Mr. Hernandez began walking down a nearby SRP canal. (Doc. 113 at 4–5). At some point, the officers observed Mr. Hernandez was carrying an object of some sort. (Doc. 113-5 at 9; Doc. 113-6 at 16; Doc. 113-7 at 16; Doc. 130 at 16). Transcripts and audio of the incident confirm that Officer Ippel described the object as an airsoft rifle, and that some witnesses expressed uncertainty as to what the object was. (Docs. 112; 113-12 – Exhibit K; Doc. 113-6 at 52-53; Doc. 113-7 at 11, 16; Doc. 130-8 at 3, 36–37). At this time, officers requested an additional unit equipped with a less-lethal "stun bag." (Doc. 130-6 at 4).

Responding to this request, Officer Janser arrived at the scene and began loading a stun bag before ultimately selecting a rifle after observing the object in Mr. Hernandez's hands. (Doc. 113 at 6; Doc. 130 at 17). Officer Janser's rifle was equipped with a scope that allowed him to observe Mr. Hernandez at a magnification of three times. (Doc. 113 at 6; Doc. 130 at 20). Ultimately, after the end of the incident, Police discovered that Mr. Hernandez was holding a light blue toy gun with blue tape wrapped around the muzzle and handle, and black tape wrapped around the barrel. (Doc 130 at 17-18). Mr. Hernandez continued to walk down the canal while non-responsive to the officers' communications.

(Doc. 113 at 6; Doc. 130 at 19). During this time, Mr. Hernandez would periodically point his gun at, or in the direction of, the officers. (Doc. 130 at 20). Accordingly, the officers increased their distance to about one hundred yards from Mr. Hernandez and, because of the distance, stopped communicating with him. (Doc. 130-9 at 4). At this point, according to the Phoenix Police Department Incident Report, Sergeant Kipper told Officer Janser, his subordinate, "He's not pointing that gun at us again, if he points it at us again, shoot him." (Doc. 130-2 at 5). Officer Ippel remembered Sergeant Kipper merely saying, "He can't point that at us again." (Doc. 113-7 at 32).

Mr. Hernandez again raised the toy gun and pointed in the direction of the officers. (Doc. 113 at 9). While approximately 347 feet from Mr. Hernandez, Officer Janser fired his first shot and hit Mr. Hernandez, who bent at the waist and grabbed an adjacent chain link fence. (Doc. 113 at 10; Doc. 130 at 21). Officers on the scene each gave various descriptions of what next occurred.

Sergeant Kipper was behind a police vehicle when "he heard those shots fired . . . [Mr. Hernandez] was holding onto a fence, and he had the gun in his hand at that time. And then I heard a couple more shots . . . ." (Doc. 113-5 at 38). Sergeant Kipper went on to explain that after he heard the first set of shots, he was able to see Mr. Hernandez:

> He is hanging onto a fence with one arm. It looks like he is trying to hold himself up . . . then he's got the rifle in his other hand, . . . he is kind of holding himself up. And then that's when I hear -- I see a little bit of movement in his hands or in his arm, and then I hear some more shots . . . .

(*Id.* at 39). When asked about whether Mr. Hernandez was pointing the object at officers before the second set of shots, Sergeant Kipper testified that "it was at an angular distance between us and his feet . . . it wasn't pointed directly at us. It wasn't pointed straight down either." *Id.* at 41.

Officer Cabrera was asked the sequence and number of shots, he testified "[i]t really happened fast. My memory, I thought he had only shot two or three times." (Doc. 113-6 at 35). When asked whether he remembered any gaps between shots, Officer Cabrera

testified "No, no, I do not remember." (*Id.* at 36). Officer Cabrera remembered hearing an initial two or three shots, and then explained "he had gotten hit, and he kind of fell back a little bit, but he was still holding the weapon, pointing in our direction." (*Id.*).

Officer Ippel, who had read the police report prior to testifying, stated that there were five shots and "[a]ll the shots were fired, essentially, one after another. It wasn't— he was still standing, still had the rifle in his hands, and was holding on to a chain-link fence." (Doc. 113-7 at 32–33). Officer Ippel further explained "[h]e was standing after the first shot. He still had the gun in his hands, slung. The—his actions did not change, that I recall, from that first shot." (*Id.* at 33). Officer Ippel remembered the gun remained pointed at the officers after the first shot. (*Id.* at 33–34).

Officer Janser explained that after the order from Sergeant Kippel, Mr. Hernandez brought the barrel toward the officers, at which point Officer Janser fired the first round. (Doc. 113-8 at 50).

> He kind of bent over real quick and came back up. He still had the rifle. I don't remember exactly . . . but it was pointing at our direction. At which point I reengaged him and fired four more rounds at him until he—the threat from my involvement had ended because he went to the ground.

(*Id.*). Officer Janser explained he took a pause:

> And it—it was not a long pause.· I kind of remember my rate of fire at the time.· It was a slower rate of fire, because due to the distance, you want to guarantee where your rounds go.· And I wanted to reacquire my sight with Mr. Hernandez rather than watching the muzzle on the firearm rise away from my target at the time. ·So it was a controlled pace.· And during our training, we are trained to fire one to five rounds.· But I remember after the first round, I saw him bend over and start to come back up, and I was already engaging on the second round, and subsequent third, fourth, and fifth.

(*Id.* at 51).

Phoenix Police did not request medical assistance until nine minutes after the final shot, medical assistance arrived 17 minutes after the final shot, and Mr. Hernandez arrived

at the hospital 30 minutes after the final shot. (Doc. 130 at 23). Mr. Hernandez was pronounced dead 28 minutes after he arrived at the hospital. (Doc. 130 at 24). An autopsy revealed high levels of methamphetamine in his system. (*Id.*).

On April 21, 2020, Justina Hernandez—on her own behalf and as the Personal Representative of Mr. Hernandez's estate—and several other family members filed this action making numerous claims against the City of Phoenix and Trevin Janser ("Defendants"). On January 12, 2021, this Court dismissed various claims. (Doc. 30). Additionally, on September 7, 2022, the Court granted the parties' joint stipulated motion to dismiss additional claims. (Doc. 66). The remaining claims are (1) the estate's 42 USC § 1983 excessive force claim against Defendant Janser, (2) the Estate's *Monell* claim against the City of Phoenix for condoning unconstitutional police shootings and/or failure to train officers, and (3) Justina Hernandez's claim of intentional infliction of emotional distress ("IIED").

On March 21, 2023, Defendants moved for Summary Judgment on these remaining claims. Plaintiff opposes Summary Judgment on the first two claims but concedes Summary Judgment is appropriate for her IIED claim.

## DISCUSSION

### I. Legal Standard

The purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"[A] party seeking summary judgment always bears the initial responsibility of

informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Parties opposing summary judgment are required to "cit[e] to particular parts of materials in the record" establishing a genuine dispute or "show[ ] that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). A district court has no independent duty "to scour the record in search of a genuine issue of triable fact[.]" *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

## II. Analysis

### A. Section 1983 Claims

A plaintiff maintaining an action under 42 U.S.C. § 1983 must establish (1) "that the conduct complained of was committed by a person acting under the color of state law," and (2) "this conduct deprived them of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Pistor v. Garcia*, 791 F.3d 1104, 1114 (9th Cir. 2015) (quoting Evans v. McKay, 869 F.2d 1341, 1347 (9th Cir. 1989)); *see also West v. Atkins*, 487 U.S. 42, 48 (1988).

### 1. 1983 Claim Against Officer Janser

Defendant Janser argues that Summary Judgment is warranted in this case because Defendant Janser is entitled to qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "In determining whether an officer is entitled to qualified immunity, [courts] consider (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014). District courts have discretion as to which prong of the qualified immunity analysis should be considered first. *See Pearson*, 555 U.S. at 236. Accordingly, the Court will first consider whether Mr. Hernandez's Fourth Amendments rights were violated by Defendant

Janser. If so, the Court will then consider whether that right was clearly established as of April 29, 2019.

### a. Violation of a Constitutional Right

Excessive force may violate the Fourth Amendment's safeguarding of the "right of the people to be secure . . . , against unreasonable . . . seizures. U.S. Const. amend. IV. The use of deadly force is, of course, a seizure. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). The question, thus, is whether Defendant Janser's use of deadly force was reasonable under Fourth Amendment jurisprudence.

"A Fourth Amendment reasonableness inquiry asks whether a particular seizure was objectively reasonable from the perspective of a reasonable officer on the scene." *Sweet v. City of Mesa*, No. CV-17-00152-PHX-GMS, 2022 WL 363999, at *4 (D. Ariz. Feb. 4, 2022) (quoting *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)). "Courts must balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* (quoting *Graham*, 490 U.S. at 396). Courts in the Ninth Circuit look to a non-exhaustive list of factors to assess the government's interests:

> (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," (3) "whether he is actively resisting arrest or attempting to evade arrest by flight" . . . (4) "the availability of less intrusive alternatives to the force employed," (5) "whether proper warnings were given," and (6) "whether it should have been apparent to officers that the person they used force against was emotionally disturbed."

*Id.* (quoting *Graham*, 490 U.S. at 396; then quoting *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 947 (9th Cir. 2017)). The most important factor is whether the suspect posed an immediate threat. *Estate of Lopez and through Lopez v. Gelhaus*, 871 F.3d 998, 1005 (9th Cir. 2017). In circumstances where deadly force is used, this factor is a requirement. *Isayeva*, 872 F.3d at 947.

Even considering the facts in the light most favorable to Plaintiff, Officer Janser

acted reasonably at least as to the first shot. It is not disputed that the decedent was carrying a replica or toy gun. The record includes other substantial evidence that the officers on the scene were unsure of whether the decedent was carrying a real firearm. In other words, the evidence indicates that the officers, including Officer Janser, believed it was possible Mr. Hernandez was carrying loaded firearm. Accordingly, when Mr. Hernandez brought the toy to his face and pointed the gun towards the officers just prior to being shot, Officer Janser and/or the other officers on the scene reasonably believed they were in immediate and life-threatening danger. Reasonable belief of immediate danger posed from a firearm is, thus, dispositive in this matter as to the first shot: by acting reasonably in firing the first shot, Officer Janser did not violate Mr. Hernandez's constitutional rights.

According to multiple witnesses, however, there was at least some pause in between shots, or series of shots, made by Officer Janser. (Doc. 113-5 at 38–39; Doc. 113-6 at 35-36; Doc. 113-7 at 32–33; Doc. 113-8 at 50). Officers must reevaluate the use of deadly force in a continuing encounter. *Zion v. Cnty. of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017). They must do so if a break between uses of such force in a continuing encounter allow the officer to evaluate whether the continued use of deadly force remains necessary. *Id.* Such a break does not have to be of long duration, mere seconds between uses of deadly force can be sufficient. *Id.* at 1075–76. In *Zion*, a man stabbed an officer in the arm with a kitchen knife. *Id.* at 1075. While the man ran toward his home, another officer shot him nine times and the man fell to the ground. *Id.* Six seconds later, the officer shot the man another nine times. *Id.* The court denied the shooting officer qualified immunity for the second volley of shots, even though the Plaintiff did not challenge the officer's reasonable use of force as to the first nine. *Id.* at 1075–76. The Court explained:

> [T]erminating a threat doesn't necessarily mean terminating the suspect. If the suspect is on the ground and appears wounded, he may no longer pose a threat; a reasonable officer would reassess the situation rather than continue shooting. This is particularly true when the suspect wields a knife rather than a firearm . . . Higgins testified that Zion was trying to get up. But we "may not simply accept what may be a self-serving account

by the police officer."

*Id.* at 1076 (citing *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014)) (citations omitted). The use or continued use of deadly force requires that a suspect pose an immediate threat. *Isayeva*, 872 F.3d at 947, s*ee also*, *Estate of Lopez*, 871 F.3d at 1005.

Plaintiff points to evidence that there was at least some pause between when Mr. Hernandez was hit by the first shot and the remaining four shots. (Doc. 113-5 at 38–39; Doc. 113-6 at 35–36; Doc. 113-7 at 32–33; Doc. 113-8 at 50). Even assuming Officer Janser had sufficient time to re-evaluate Mr. Hernandez's threat level—which we are bound to do in a motion for summary judgment—no issues of fact remain as to Mr. Hernandez's actions after the first shot. The Officer witnesses make differing, but similar, descriptions. Plaintiff fails to raise a material issue of fact suggesting the decedent did not present an immediate threat after the first round of shots. She includes a diagram from the medical examiner that she says indicates that some of the shots hit Plaintiff while he laid face down on the ground. (Doc. 121 at 23) Nevertheless, those factual assertions are not supported by any testimony or evidence that is admissible. *See Celotex Corp.*, 477 U.S. at 323–24 ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . .").

Taken together, the admissible testimony describes that Mr. Hernandez was standing, gripping a nearby fence for support, and continued to hold his weapon either at a raised and downward angle or directly at the officers. Further, multiple officers testify that just prior to the second shots, Mr. Hernandez made a sudden upward movement. Importantly, however, Plaintiff has not presented testimony that Mr. Hernandez clearly ceased being a threat after the first shot. The record does not, for example, include testimony that Mr. Hernandez either fell prone, dropped the weapon, or began to retreat after the first shot. Accordingly, even if Officer Janser had sufficient time to reassess, he did not act unreasonably in finding that Mr. Hernandez continued to pose an immediate threat.

The record indicates that Officer Janser acted reasonably with both sets of shots,

either because he did not have time to re-assess, or because Officer Janser reasonably believed Mr. Hernandez continued to pose an immediate threat after the first shot. Accordingly, Officer Janser is entitled to qualified immunity in this matter.

### 2. *Monell* Claim Against the City of Phoenix

"[M]unicipalities and other local government units" may be sued as persons under Section 1983. *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978). But "a plaintiff must go beyond the respondeat superior theory of liability[,]" *Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 793 (9th Cir. 2016), because liability only attaches where "the municipality itself causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original). The elements of a municipal Section 1983 claim are (1) the deprivation of a constitutional right, which was (2) caused by a policy or custom of the local government unit, and (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional rights. *See Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1073–1077 (9th Cir. 2016).

As discussed in the previous section, Plaintiff has presented sufficient facts to allow a reasonable jury to find Mr. Hernandez was deprived of his Fourth Amendment rights. To succeed on a *Monell* claim, the City's must have shown deliberate indifference to Mr. Hernandez's constitutional rights. First, however, Plaintiff must establish an action or policy by the City of Phoenix caused the deprivation of Mr. Hernandez's constitutional rights.

At oral argument, Plaintiff's counsel specified that the policy or training error allegedly responsible for the depravation of Mr. Hernandez's rights was Officer Janser's training to shoot repeated shots without reassessing danger. However, Plaintiff's expert fails to make the same assertion. Instead, Plaintiff's expert identifies that Officer Janser was not provided enough training for dealing with people experiencing "a mental crisis." (Doc. 137-1 at 19–24). While the expert explains that the secondary shots could only be reasonable if Mr. Hernandez posed a continuing threat, he does not sufficiently identify any pattern or improper training that specifically made Officer Janser fail to reassess the

threat level. (*See id.* at 9–27). Because *Monell* liability requires causation as well as deliberate indifference, Plaintiff's expert needed to show that Defendant specifically trains officers to fire multiple rounds while ignoring a reasonable opportunity to reassess. This is different from a lack of training for interacting with people experiencing mental crisis. These issues, though related, remain too far apart for causation: one involves training officers to accurately assess danger posed by a particular subset of individuals, while the other involves training officers not to reassess. At base, while Officer Janser may have failed to reassess, the Plaintiff does not present evidence to show that potential failure was caused by his training.

Because Plaintiff's evidence does not support its theory of *Monell* liability, Defendant is entitled to summary judgment on that claim.

## CONCLUSION

Accordingly,

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (Doc. 112) is **GRANTED.**

**IT IS FURTHER ORDERED** directing the Clerk of Court to enter final judgment consistent with this Order and to close this case.

Dated this 2nd day of May, 2024.

G. Murray Snow
Chief United States District Judge